IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

LEONA WALKER,

    Plaintiff,

  Vs.        No.  03-4154-SAC

R. L. BROWNLEE,
Acting Secretary of the Army,

    Defendant.

MEMORANDUM AND ORDER

   This Title VII hostile work environment case comes before the court

on the defendant's motion for summary judgment (Dk. 19), the plaintiff's response

opposing summary judgment (Dk. 27), and the defendant's reply (Dk. 30).  During

the relevant time periods, the plaintiff, Leona Walker, was employed as a full-time

registered nurse at Irwin Army Community Hospital in Fort Riley, Kansas.  The

plaintiff is an African-American black female who alleges that while supervised by

Major Neva Westhoff, a Caucasian female, from October of 1998 through July

2001, she was subjected to a racially hostile work environment in violation of 28

U.S.C. §  2000e-2.

**SUMMARY JUDGMENT STANDARDS**

   A court grants a motion for summary judgment under Rule 56 of the

Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law.  The court is to determine "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude summary judgment." *Id*.  There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992).  If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir. 1993) (citations omitted).  The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at

2

586; it requires "'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.'" *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir. 1995) (quoting *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir.1991)).[1]

All inferences arising from the record must "be drawn and indulged in favor of the party opposing summary judgment." *Stinnett v. Safeway, Inc.*, 337

---

[1]The extensive record of sworn testimony here is unique for an employment discrimination case.  The record is the result of an investigation by the Office of Complaint Investigations with the Department of Defense and an administrative hearing before the Equal Employment Opportunity Commission.  Though the parties agreed to submit the entire record in this summary judgment proceeding, this does not create any obligation upon the court to read more than the references cited in the parties' memoranda. The Tenth Circuit has repeatedly said that "'[w]ithout a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.'" *Elliot Industries Ltd. Partnership v. BP America Production Co.*, 407 F.3d 1091, 1122 (10th Cir. 2005) (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir.1995)).  "[O]n a motion for summary judgment, 'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record.'"  *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (citations omitted); *see also Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000) ("The district court was not obligated to comb the record in order to make [the plaintiff's] arguments for him.").  In ruling on the disputes over the genuine issues of material fact, the court relied principally on the facts and inferences drawn from the pages of testimony cited by the parties.  In deciding the sufficiency of the plaintiff's evidence, however, the court also considered the plaintiff's allegations of hostile incidents which the defendant assumed as true and challenged only as being racially-neutral events.

3

F.3d 1213, 1216 (10th Cir. 2003) (internal quotation marks omitted).  A party

relying on only conclusory allegations, however, cannot defeat a properly

supported motion for summary judgment.  *White v. York Intern. Corp.*, 45 F.3d

357, 363 (10th Cir. 1995).  "[I]t is not enough that the nonmovant's evidence be

merely colorable or anything short of significantly probative."  *Revell v. Hoffman*,

309 F.3d 1228, 1231 (10th Cir. 2002) (citations and quotations omitted).  The

plaintiff "must establish, at a minimum, an inference of the existence of each

element essential to the case."  *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1201

(10th Cir. 2003) (internal quotation marks omitted).

On summary judgment, a court may consider only evidence whose

content or substance is admissible. *Lewis v. Four B Corp.*, 347 F. Supp. 2d 1017,

1021 (D. Kan. 2004); *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir.

1995).  It is well established that Rule 56 precludes the use of inadmissible hearsay

in depositions submitted in support of, or in opposition to, summary judgment.

*Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995).  Similarly,

statements of witnesses that are not based on personal knowledge must be

disregarded. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  "Where a

plaintiff relies upon 'shop talk' or hearsay and lacks firsthand knowledge that other

employees were similarly situated or were treated differently, such testimony is

4

inadmissible in opposition to a motion for summary judgment. *Hysten v. Burlington Northern and Santa Fe R. Co.*, 167 F. Supp. 2d 1239, 1249 (D. Kan. 2001) (citation omitted). "Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment." *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) (citations omitted).

**STATEMENT OF UNCONTROVERTED FACTS**

1.  Since 1994, the plaintiff, Leona Walker, has worked full time as a civilian registered nurse with the Department of Nursing, Irwin Army Community Hospital, Fort Riley, Kansas.  During the time period relevant to this lawsuit, Walker's first line supervisor was the Head Nurse, Major Neva Westhoff, a Caucasian female. Her second line supervisor was the Chief of Nurse Operations, Lieutenant Colonel Margaret Hawthorne, an African-American female, and her third line supervisor was the Chief Nurse, Colonel Natalie Shriver, a Caucasian female.

2.  In early 2000, Major Westhoff began directly supervising Walker, and Walker quickly noticed that the Major seemed to ignore Walker or acted like she didn't understand what Walker was asking.  From these interactions and from what she had heard from co-employees, Walker decided it would be best to limit her interactions with the Major to "only when necessary."

3.  Walker has testified that she first noticed some overt tension between her and Major Westhoff when in early 2000 she telephoned Major Westhoff at the major's home about 2:00 a.m. seeking permission for another staff member to leave work early.  Walker believed she was following Major Westhoff's prior directives in making this telephone call.  According to Walker, during this telephone conversation Major Westhoff said, "Why are you calling me?  You hate me, don't you."  Walker did not respond to this query.  Major Westhoff then asked for Walker's opinion on whether the employee should be allowed an early departure, and when Walker answered, "yes," then Westhoff approved the request and the telephone conversation ended.

4.  Walker admits that Major Westhoff didn't chastise her for this telephone call.  Walker, however, says she was "shocked" by Major Westhoff's comment that Walker hated the Major.  Walker further admits that Major Westhoff never mentioned this telephone call again in their conversations and that she did not tell Major Westhoff that the Major's comment offended her.

5.  The next significant event occurred a few months later.  During the night shift of March 26, 2000, the charge nurse, Larette Lynch, and Walker decided for that night to deviate from the normal procedure on couplet care to mothers and babies.  When Major Westhoff learned about this deviation the next morning, she

6

confronted the nurses about their decision.  After hearing Walker's explanation,

Major Westhoff became upset and "blew up" cursing and yelling at them.

According to both Walker and Lynch, Major Westhoff directed her disapproval

and comments at Walker and ignored Lynch's efforts to accept some of the blame

for the decision.  After several minutes or more, Major Westhoff said "never mind,

I have to go to report" and then walked off.  Walker and Lynch were not

reprimanded nor subjected to any disciplinary action related to this incident.

6.  After Major Westhoff walked away, Lynch opined to Walker that the

Major singled out Walker because the Major appeared to dislike Walker and the

Major's feelings were related to Walker being black.  While Walker recognized the

possibility that Lynch was right about the Major's racially-driven feelings towards

her, she still did not believe at this point that the Major's problems were racial.

7.  Bothered by what had happened, Walker wanted to meet with Major

Westhoff.  About this same time, Sheila Colangelo told Walker that Colangelo was

upset with how Major Westhoff had confronted Colangelo about an issue and that

she was going to request a meeting with Major Westhoff.  Walker asked Colangelo

to inquire if Major Westhoff would consent to Walker also attending this meeting.

Colangelo later called back Walker with news that Major Westhoff had scheduled a

meeting for both of them on the morning of March 29, 2000.

8.  At this meeting on March 29th, Walker explained to Major Westhoff that she felt there was a communication problem between them and she wanted to resolve it.  Walker has testified that Major Westhoff asked Walker if she wanted to know what the problem is and Walker said she did.  According to Walker, Major Westhoff repeated this same statement, pounded her first on the table, and said, "it's because, Mrs. Walker, I feel you are an angry black woman with a chip on your shoulder.  You resent me because I'm white with blonde hair and I make the decisions.  She said, you hate me, you see me as a devil with two horns and a tail." (Dk. 20, Ex. 2, p. 59).  Walker has testified that Major Westhoff then described three prior incidences which she characterized as interactions with "angry black women" (Ex. C, Vol. 2, OCI Trans. p. 20).  According to Walker, both she and Colangelo "had our mouths open" in reaction to the Major's comments. (Dk. 20, Ex. 2, p. 59).  Walker said Major Westhoff's statement "shocked" and "stunned" her, but she remained calm during the meeting.  *Id*. at 59, 62-63.  Colangelo said she didn't want to be there after hearing Major Westhoff's comment and started a conversation with Sergeant Marshall to avoid hearing what else was being said.

9.  As a result of this meeting, Walker came to the conclusion that her problems with Major Westoff were related to her race.  After the meeting, Major Westhoff did not approach Walker to discuss again what had occurred or been

8

said during it.  Only after complaining to higher level supervisors did Walker tell Major Westhoff that she found Westhoff's comments offensive.

10.  Walker sought the advice of her union representative, Pam Foltz, who then coordinated a meeting between Foltz, Walker, and Major Westhoff's supervisor, LTC Hawthorne.  Walker told LTC Hawthorne that she was unhappy and that Major Westhoff had called her an "angry black woman."  Walker said that she "didn't want anything to be done about" her complaint, but LTC Hawthorne informed her the situation was one that required action.  (Supplement to Plaintiff's Response, Ex. F, Vol. 3, p. 398).  This meeting with Walker and Foltz was the first time that LTC Hawthorne or any other supervisor of Major Westhoff had received any complaint or allegation about discrimination by Major Westhoff.  LTC Hawthorne advised Walker to provide a written statement which was done several weeks later.

11.  LTC Hawthorne immediately informed COL Natalie Shriver of this complaint, and both initiated an inquiry and confronted Major Westhoff with Walker's allegations.  Major Westhoff admitted having made the comment about the "angry black woman" but said that Walker had taken the statement out of context as it was intended to be an analogy to past experience and not intended to be discriminatory.

12.  After receiving Walker's letter alleging racial discrimination, COL Shriver met individually with the union representative, Pam Foltz, and then jointly with Foltz and Walker to discuss the allegations.  Both Foltz and Walker told COL Shriver that Walker did not want any action taken but did want Major Westhoff's superiors to know what had happened.  COL Shriver informed them that this allegation would be treated seriously and that an investigation would be completed.

13.  COL Shriver asked the hospital commander, COL Dean Giutlitto, to commission an investigation pursuant to Army Regulation 15-6 ("AR 15-6").  When COL Shriver told Walker that the commander had been notified of her letter, Walker appeared upset and questioned COL Shriver's decision to tell the hospital commander.  COL Shriver explained that the commander must be informed of allegations of discrimination so that all proper steps are taken to bring resolution.

14.  Major Kareece Larry, an African-American female, was appointed the AR 15-6 investigating officer.  Appointed by the hospital commander, the investigating officer interviews relevant witnesses, investigates the facts, and then reports her findings in writing to the hospital commander.  In her 15-6 report submitted in July of 2000, Major Larry wrote:  "A preponderance of the evidence leads me to believe that Major Neva J. Westhoff has, indeed, made statements with negative overtones which could be viewed as racial discrimination."  Major Larry

testified, however, that she concluded there was no racial discrimination because Major Westoff's actions did not indicate discrimination and her racially-charged language appeared to be simply poor judgment in choosing words.  Major Larry also observed that the communication problems between Walker and Westoff appeared personal with Walker believing that Westoff had not shown her the proper professional respect.

15.  COL Shriver reviewed Major Larry's findings and agreed with the conclusion of no intentional race discrimination and with the recommendation that Major Westhoff attend training sessions on sensitivity and communication.  In response, COL Shriver counseled Major Westhoff on communication skills, ordered the Major to attend the training sessions and to make a formal apology to Walker.  Major Westhoff complied with these orders.[2]  Major Westhoff attended the sensitivity training in August of 2000.

16.  In September of 2000, COL Shriver met with Walker and her attorney to discuss Major Larry's reported findings from the AR 15-6 Investigation.  Shriver further explained that if Walker was not satisfied then she could file a complaint

------

[2]Without a cite to the record, the plaintiff denies that Major Westoff's statement was an apology and alleges that Major Westoff simply said she was sorry for the plaintiff's hurt feelings caused by her remarks.  This, however, does not give rise to a genuine issue of material fact.

11

with the Army's EEO office.

20.   COL Shriver has testified that she did not receive from Walker any further complaints or allegations of race discrimination or harassment by Major Westhoff after Walker's initial letter that resulted in the AR 15-6 Investigation.[3]

21.   In August of 2000, Walker contacted the Fort Riley EEO office with allegations of a racially hostile work environment.  In November of 2000, Walker filed a formal EEO complaint alleging that Major Westhoff had subjected her to a racially "hostile and intimidating work environment."  The Fort Riley EEO office notified Walker in December that it would be investigating her hostile work environment claim.

22.   An investigator with the Department of Defense Office of Complaint Investigations gathered facts, including sworn statements from witnesses.  The plaintiff was unsuccessful in securing relief on her administrative claims for a hostile work environment.  On August 8, 2003, the plaintiff filed the present lawsuit.

**ADDITIONAL STATEMENT OF FACTS OFFERED BY PLAINTIFF**

---

[3]The plaintiff's generally denies this statement but then explains that she worked at keeping the hospital environment focused on patient care and left the prosecution of her complaint to her attorney.  The plaintiff offers no citation of record in support of her position.  The court does not find any genuine issue of material fact.

23. Pam Foltz described the plaintiff's work as "a very stressful area" that can be exacerbated by interpersonal issues. (Ex. C, Vol. 2, OCI Trans. pp. 199-200).

24. Several days after Major Westhoff's "angry black woman" comment, the plaintiff telephoned Pam Foltz. The plaintiff was "in tears" and "was still upset about" the meeting and comment. (Ex. C, Vol. 2, OCI Trans. p. 204).

25. The plaintiff and many of her co-workers testified to the tense interactions and communication problems between the plaintiff and Major Westhoff, and Major Westhoff admitted the tension was obvious to everyone.

a. After the "angry black woman" comment, the plaintiff said more incidents occurred between them. When staff would tell the plaintiff that Major Westhoff was complaining about what the plaintiff had said or done, the plaintiff would take this information to Major Westhoff who would brush her off with the comment that if there was a problem then she would come to the plaintiff. The plaintiff also experienced situations when Major Westhoff misinterpreted or misrepresented concerns she had raised with the Major.

b. Ms. Colangelo said she observed that they had "definite communication problems" and that it was a "tense situation" whenever they were together. Ms. Colangelo opined that Major Westhoff had the communication problem,

13

not the plaintiff.

c.  While explaining that she did not work with the plaintiff very much, Lt. Stacy Blalock did testify to witnessing one event when the plaintiff asked Major Westhoff for guidance on when to lock the doors to their unit and Major Westhoff "tried to blow her off and just didn't answer her."  (Ex. B, Vol. 1, OCI Trans. pp. 226-27).  Ms. Blalock also heard the Major say things about the plaintiff's attitude or demeanor, such as the plaintiff was "passive/aggressive" and had a "smug look."  *Id*. at pp. 227-28.  Based on her observations of their interaction and tension, Ms. Blalock believed the plaintiff could question the effectiveness of going to Major Westhoff with her concerns.

26.  Major Westhoff admitted knowing that the plaintiff was "afraid to approach" her "for something as simple as" verification of her nursing license which the Major Westhoff usually handled for all of the nurses under her supervision.  (Ex. C, Vol. 2, OCI Trans. p. 106).

27.  The plaintiff testified that the nurses with whom she worked were uncomfortable with what Major Westhoff was saying about the plaintiff and with what was happening between the Major and the plaintiff.

28.  Even Major Westhoff observed that the tension between her and the

plaintiff was so pervasive as to harm the care being offered and the morale of the unit:

> But I always felt like there was some breach between our, barrier between our communication and I really wanted the same goal that Leona wants, I wanted to get past that because I felt like I had been there already for a year and a half and I felt the tension there, I didn't feel like I could openly communicate with her.  I didn't feel like I had built a rapport with her that I had with most of the other nurses, and I wanted to get past that because I realized it was hurting the unit.  It was hurting patient care, it was hurting the morale of the staff.

(Ex. C, Vol. 2, OCI Trans. p. 92).

29.  Sheryl Edison, a ward clerk in the plaintiff's unit, testified that the plaintiff worked in a hostile environment.  Ms. Edison said the Major Westhoff treated her similarly with insults and profanity.  Ms. Edison said her husband was black.  Lorette Lynch is a staff nurse who works in the same unit and on the same shift as the plaintiff.  Ms. Lynch also testified that the plaintiff worked in a hostile environment and that she saw Major Westhoff treat the plaintiff differently.  Cynthia Neff, another nurse who witnessed interactions between the plaintiff and Major Westhoff at morning report, testified that there was an obvious personality conflict between them and that Major Westhoff was colder and less friendly towards the plaintiff.

30.  The plaintiff believes Major Westhoff's actions towards her interfered

15

with the plaintiff's ability to focus on patient care and to maintain a spirit of teamwork among her fellow nurses.

31.  The plaintiff told Colonel Shriver that the sensitivity training for Major Westhoff had not been effective in improving the situation.  Colonel Shriver did not offer any other suggestions for assistance in dealing with the matter.

32.  For her own sake, the plaintiff decided to minimize her contacts with Major Westhoff and to speak with her only when others were present.

33.  During the OCI investigation, Major Westhoff was questioned about the "angry black woman" comment.  She denied that she ever directly called the plaintiff an "angry black woman" and explained:

> I said I could not figure out any other reason why our relationship was so strained.  I didn't understand what I had done to her.  I felt like she didn't like me.  I felt like she didn't respect me.  I felt like that every time I said something to her, she got defensive.  And I said, and I don't understand where that's coming from because I didn't feel like I had treated Mrs. Walker differently than any of my other employees, but yet there was this barrier there.  And I said it reminded me of times when I have had situations that have come with other black females who the same situation, I didn't know what I had done to make this person upset with me, but they were upset with me, and I couldn't really figure out why.
> Q.  So did you kind of imply, well, maybe it's because of race or anything like that?
> A.  No, I didn't directly say that sir.
> Q.  Okay.
> A.  But that was the whole point.

(Ex. C, Vol. 2, OCI Trans. pp. 122-23).

16

## GOVERNING LAW AND ANALYSIS

Title VII forbids employment discrimination on the basis of race.  42

U.S.C. § 2000e-2(a)(1).  "Title VII affords employees the right to work in an

environment free from discriminatory intimidation, ridicule, and insult."  *Meritor*

*Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  To survive summary judgment

on a racially hostile work environment claim, a plaintiff must show a rational jury

could find from the totality of the circumstances (1) "that the workplace is

permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently

sever or pervasive to alter the conditions of the victim's employment and create an

abusive working environment," *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219

(10th Cir. 2003) (quotation omitted) and (2) that the hostility or harassment is based

upon the plaintiff's race, *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)

(citation omitted).  And the "objectionable environment must be both objectively

and subjectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so."  *Stinnett*, 337 F.3d

at 1219 (quotation omitted).

The objectionable conduct must be either severe or pervasive.  *Penry*

*v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998).  This

test is disjunctive with either element affording a sufficient, independent ground for

a hostile work environment claim.  *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).  "Courts attempting to make the determination of whether the environment is hostile must examine all of the circumstances alleged, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Jones v. Barnhart*, 349 F.3d 1260, 1268 (10th Cir. 2003) (quotation omitted).  In judging hostility, courts "should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of" jokes, occasional teasing or offhand comments and complaints concerning isolated incidents or amounting to little more than mere inconveniences.  *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1280, 1281 (10th Cir. 2005).  On the other hand, the Tenth Circuit has observed "that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is 'quintessentially a question of fact.'"  *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quoting *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994)).

"Title VII is not a code of workplace conduct, nor was it 'designed to bring about a magical transformation in the social mores of American workers.'" *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (quoting *Gross v.*

18

*Burggraf Constr. Co.*, 53 F.3d 1531, 1543 (10th Cir. 1995)).  The plaintiff must come forward with evidence from which a rational jury could find that she "was the object of harassment because of her" race.  *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d at 1261.  Thus, a hostile work environment claim requires proof of not only severe or pervasive harassment but proof that the harassment is based on the defendant's race.

In moving for summary judgment, the defendant first seeks to filter out those workplace incidents that are not race-based.  The defendant quotes over a page of events and occurrences alleged in the plaintiff's complaint and summarily characterizes them as "race-neutral allegations."  The defendant contends the plaintiff is unable to offer any evidence that these incidents have any racial content, racial connotation, or implied references to race.  The defendant asks the court to treat these incidents as simply work-related interactions between the plaintiff and Major Westhoff and to disregard these events for purposes of analyzing the hostile work environment claim.  As for the remaining incidents, which the defendant concedes are arguably race-related when viewed in a light most favorable to the plaintiff, the defendant challenges them as neither so severe nor pervasive as to have altered the terms or conditions of the plaintiff's employment.

The plaintiff responds that Major Westhoff's "angry black woman"

19

comment is a racially-charged remark about which the Major testified was the "whole point" of her stated explanation for the tension and antagonism between the plaintiff and her.  The plaintiff submits the evidence shows Major Westhoff systematically and continuously mistreated the plaintiff due to her race and also disparately treated other staff who were involved in interracial relationships.

The defendant premises the success of the motion for summary judgment on a large number of the alleged objectionable incidents of conduct not being considered in the evaluation of the pervasiveness prong, because those incidents appear to be race-neutral, work-related events.  The defendant's approach fails to account for the Tenth Circuit's precedent that holds:  "'Facially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct.'"  *Chavez*, 397 F.3d at 833 (quoting *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)).  The Tenth Circuit in *Chavez* explained:

> This is because what is important in a hostile environment claim is the *environment*, and gender-neutral harassment makes up an important part of the relevant work environment.  Conduct that appears gender-neutral in isolation may in fact be gender-based, but may appear so only when viewed in the context of the gender-based behavior.  *Penry*, 155 F.3d at 1262. Thus, when a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context,

20

> "reasonably could view all of the allegedly harassing conduct . . . as the product of sex and gender hostility," then "it is for the fact finder to decide whether such an inference should be drawn." *O'Shea*, 185 F.3d at 1102, 1097 (emphasis omitted).

397 F.3d at 833. In *O'Shea*, the Tenth Circuit said it agreed with the Eighth Circuit that facially neutral conduct may have relevance in actions for race or sex discrimination:

> racial epithets are often the basis of racial harassment claims[] and may likewise create an inference that racial animus motivated other conduct as well.
>
> All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus. Harassment alleged to be because of sex need not, be explicitly sexual in nature.

185 F.3d at 1097 (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999)). The court must analyze first whether a jury viewing the race-neutral incidents in the context of the race-based incidents could reasonably find that all of the incidents were the result of racial hostility.

The plaintiff asserts several race-based incidents. Major Westhoff criticized the plaintiff for placing an African-American patient in a private hospital room and then told another nurse that she believed Walker placed this patient in a private room in order to upset the Major. Another incident concerned Major Westhoff's disparate criticism of the plaintiff for a decision jointly made by her and

another nurse who was Caucasian.  The plaintiff points to the sweeping and pointed nature of Major Westhoff's "angry black woman" remarks and her efforts to explain them away.  Major Westhoff's treatment of a ward clerk deteriorated after learning the clerk's husband was African-American.  Besides being evidence of racial harassment, these incidents also may support an inference of racial animus on Major Westhoff's part.

There is nothing of record to suggest that the plaintiff was anything but an exemplary nurse and employee or that her problems at work were due to anything else but conflicts and incidents between her and Major Westhoff.  All of the incidents alleged by the plaintiff, both the race-neutral and race-related ones, involve decisions, actions, and statements made by Major Westhoff.  Based on the above evidence of Major Westhoff's racial animus viewed in the light most favorable to the plaintiff, the court believes a reasonable jury could find from the evidence in its totality that a racial motive was behind all or most of Major Westhoff's hostile actions towards the plaintiff.  *See Chavez*, 397 F.3d at 837. Now inferentially linked to evidence of discrimination, the whole group of alleged incidents must be evaluated under the severity or pervasiveness prong.

The defendant's motion for summary judgment does not address whether the incidents when considered in their entirety meet the threshold of severe

or pervasive.  Consequently, the defendant's arguments that the plaintiff is unable to meet this threshold are incomplete and fail to account for all of the alleged incidents.  Throwing in all of the incidents decisively changes the analysis on whether the plaintiff's work environment was hostile or not.  Two of the four frequently discussed factors would now arguably favor the plaintiff.  When viewed in the light most favorable to the plaintiff, the summary judgment record and the plaintiff's allegations assumed true by the defendant show Major Westhoff frequently discriminated against the plaintiff in her criticism of and interaction with the plaintiff.  The Major singled out the plaintiff for criticism, used an angry and condescending tone towards the plaintiff, denied her training, routinely brushed off her comments and concerns as insignificant and unworthy of the Major's time, avoided speaking directly with the plaintiff and asked others to explain the plaintiff's statements, accused the plaintiff to her co-workers of having harmful and subversive intentions, and fostered the tension and communication problems between them.  This pattern of discriminatory conduct was demeaning and belittling to the plaintiff as well as troubling and unsettling to co-workers.  The other factor is that this discrimination interfered with the plaintiff's ability to do her job, to care for her patients, and to maintain a spirit of teamwork with her co-workers.  Major Westhoff even testified that the problems between her and the plaintiff had

23

escalated to the point that it was "hurting the unit, . . . hurting patient care, . . . [and] hurting the morale of the staff."  (Ex. C. Vol. 2, OCI Trans. p. 92).  The plaintiff became afraid to approach Major Westhoff and to ask for the advice and guidance expected from a supervisor.  The plaintiff resorted to avoiding Major Westhoff and to having contact with her only when others were present.

Though the plaintiff's evidence of a hostile work environment is not particularly strong or compelling even considering all of the race-related and race-neutral incidents, the court believes it is enough to create a material dispute over whether the discrimination was sufficiently pervasive to alter a condition of employment and create an abusive environment.  And when the circuit has said that this evaluation is one particularly unsuited for summary judgment and when the defendant's motion fails to account for all alleged incidents in arguing this issue, the denial of summary judgment is the necessary result.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 19) is denied.

Dated this 30th day of August, 2005, Topeka, Kansas.


s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge


24